J. Baker Bryan and Mary Evelyn Bryan v. Commissioner. J. Baker Bryan v. Commissioner.
Bryan v. Commissioner
Docket Nos. 21049, 21050.
United States Tax Court
1951 Tax Ct. Memo LEXIS 75; 10 T.C.M. (CCH) 987; T.C.M. (RIA) 51313; October 10, 1951
*75 Over a period of years, petitioner's increase in net worth plus non-deductible expenditures were far in excess of his income as reflected in his income tax returns for those years. His records for such period were incomplete, and he failed to prove the existence of a large amount of cash on hand from a prior period. Held, under all the facts, the respondent was justified in using a net-worth method to compute petitioner's income for such period and that some part of the deficiency for 1937, 1938, 1939, and 1941 through 1944, inclusive, was due to fraud with intent to evade tax. C. J. Batter, Esq., 917 17th St. N.W., Washington 6, D.C., for the *76 petitioners. S. Earl Heilman, Esq., and Frank M. Thompson, Jr., Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion These proceedings, which were consolidated for hearing, involve income tax liabilities and penalties. In his notices of deficiencies dated August 30, 1948, the respondent determined deficiencies and penalties for the taxable years 1935 through 1944, as follows: Docket
Delinquency
No.
Year
Deficiency
Penalty
Penalty
21050
1935
$ 2,636.59
$ 1,318.30
1936
16.00
8.00
1937
234.05
117.03
1938
3,854.75
1,927.37
1939
434.08
217.04
1940
1,035.90
517.95
1941
2,154.60
1,077.30
1942
4,690.46
2,345.23
1943
9,072.30
4,536.15
$2,268.08
21049
1944
58,275.74
29,137.87
The respondent has now conceded that there are no deficiencies or penalties for 1935, 1936, and 1940. The issues to be decided are (1) whether respondent erred in determining petitioner's taxable income by the net-worth method; (2) whether any part of the deficiency determined for each year is due to fraud with intent to evade taxes so as to lift the years out of the statute of limitations, and *77 (3) whether, if no fraud is found, petitioner omitted from gross income for 1943 and 1944 amounts properly includible therein, in excess of 25 per cent of the gross income reported in his returns so as to make a five-year statute of limitations applicable for those years. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. J. Baker Bryan (hereinafter referred to as petitioner), and Mary Evelyn Bryan (hereinafter referred to as Evelyn), [1] his present wife, were married in 1926. His three children, one from a previous marriage, were born in 1915, 1927 and 1929. Petitioner filed his first Federal income tax return in Jacksonville, Florida, for the year 1920. No other returns were filed until 1933, in which year delinquent returns for the years 1925, 1926, 1927, 1928, 1929, 1930, and 1931 were filed. In 1935 he filed a delinquent return for the year 1934. The following tabulation shows the Federal income tax returns filed by petitioner for the years 1935 to 1943, inclusive: Source of Income
Net
Tax
and
Income
Liability
Year
Date
Amounts Reported
Reported
Reported
1935
Mar. 16, 1936
Restaurant & Bar (Loss)
( 1,321.40)
Duval Spirits Co.
10,981.84
Total
9,660.44
$9,630.44
$337.74
1936
Mar. 30, 1937
Restaurant & Bar
2,220.59
2,220.59
None
1937
Mar. 15, 1938
Tavern & Cottages
6,261.72
Rents & Royalties
1,046.46
Total
7,308.18
6,572.41
118.90
1938
Mar. 14, 1939
Tavern (Loss)
(433.17)
Rents & Royalties
3,485.00
Total
3,051.83
2,949.23
None
1939
Unknown but
Unknown
Unknown
None
timely
1940
Mar. 14, 1941
Tavern (Loss)
(8,210.87)
Rents & Royalties
4,524.00
Total
(3,686.87)
(3,686.87)
None
1941
Mar. 16, 1942
Night Club
2,865.60
Partnership-Main St. Club
2,086.86
Rents & Royalties
2,340.01
Total
7,292.47
3,869.50
104.95
1942
Mar. 14, 1943
Night Club-Main St. Road
1,062.80
Rents & Royalties
4,981.05
Total
6,043.85
4,476.35
405.00
1943
Apr. 16, 1945
Skyway Club (Loss)
(47,582.38)
Showboat Club
14,963.01
Horseshoe Bar
6,016.80
Rolling Stone
956.65
Other Property & Rents
1,478.90
Brack's
4,200.00
Beat My Shake
22,000.00
Total
$ 2,032.68 [2]
1,814.67
None
*78 In 1933 Evelyn filed a non-taxable delinquent Federal income tax return for the year 1927, and filed no other Federal income tax return until the year 1944. On May 4, 1945, she and petitioner filed a joint Federal income tax return for the year 1944, reporting gross income as follows: Income
Source
(Loss)
Showboat
($14,087.81)
Skyway
20,708.17 Rolling Stone
325.00 Windmill
(252.50)
The Drum
(697.02)
Fernandina Park Building
(233.17)
Newnan St. Building
2,353.26 Esquire-Fernandina
(16.66)
Englewood
58.00 Miscellaneous Rentals
(3,274.45)
Gains from Sales of Capital Assets
2,841.25 Total Income
$ 7,724.07 The net income and tax liability reported on the return were $7,127.34 and $1,316.93, respectively. No waiver, agreeing to extend the period within which an assessment of income tax may be made, was executed for any of the years here involved. The Commissioner made jeopardy assessments for each of the years 1935 to 1944, both inclusive, which jeopardy assessments were revised in minor amounts *79 on a later date. The jeopardy assessments, as revised, and the amounts collected by the collector of internal revenue since the making of the jeopardy assessments are as follows: Total
Tax
Penalty
Interest
Collected
1935
$ 2,651.59
$ 1,318.30
$ 2,695.45
$ 6,665.34
1936
16.00
8.00
15.41
39.41
1937
234.05
117.03
207.62
558.70
1938
3,854.75
1,927.37
3,160.39
8,942.51
1939
436.08
218.04
328.06
982.18
1940
1,035.90
517.95
708.92
2,262.77
1941
2,154.60
1,077.30
1,329.63
4,561.53
1942
4,700.46
2,350.23
2,632.32
9,683.01
1943
9,111.74
6,804.23
4,748.80
20,664.77
1944
58,275.74
29,137.87
19,021.20
106,434.81
$82,470.91
$43,476.32
$34,847.80
$160,795.03
The three-year statute of limitations for each year expired prior to the making of the jeopardy assessments or the mailing of the deficiency notices. Petitioner was born on June 23, 1885, at New Bern, North Carolina. While a resident of New Bern, he operated a saloon in which he sold whiskey illegally at wholesale and retail and also operated a gambling club room. In addition, he owned two houses and their furnishings which he rented to others who, *80 with petitioner's knowledge, used them as houses of prostitution. After he got into some sort of "trouble", he went to Savannah, Georgia, and did several things, including a barber shop, a meat market, slot machines, saloons, bars and grills. He remained in Savannah, Georgia, for five or six years, until about 1910 or 1911 when he became a resident of Jacksonville, Florida. In Jacksonville, during the years in which National Prohibition was in force, petitioner was engaged in illegal importation of liquor into the United States. During the taxable years, he operated slot machines, bars, restaurants, grills and clubs, including a business variously known as Pig Stand, Baker's Barbecue, and Skyway Club; the Esquire Club, sometimes known as Fernandina or Fernandina Club; the Horseshoe Bar, sometimes referred to as Southside; the Showboat; the Rolling Stone; the Windmill; The Drum; and, for about six months in 1937, the Wonder Bar at Ashley and Davis Streets. There was a gambling room at the Skyway Club which, during the taxable years, was operated primarily by concessionaires under a percentage arrangement with petitioner. In some instances the concessionaire also paid for the expenses *81 of the orchestra, floor shows and advertising for the entire business establishment. Some of the concessionaires lost money and gave it up. There was also a club room in operation by a concessionaire at the Esquire Club during the latter part of 1939 or the beginning of 1940. Petitioner's books consisted of cash receipts and disbursement journals. One was kept for the Skyway Club, one for the Esquire Club, and one for the Showboat. The receipts were entered from the cash register tapes and were broken down by means of punching different symbol keys of the cash register for the different classifications. For example, receipts of the Skyway Club were broken down as follows: food, bar drinks, whiskey, cigars and candy, and cabins. Monthly summarization sheets were made from the cash journals and then an annual recapitalization was made from the monthly sheets. The annual recapitalizations for 1938, 1940, and 1941 list receipts and expenditures for the Pig Stand and for Fernandina; the one for 1942 lists receipts and expenditures for the Pig Stand and Southside. The 1941 and 1942 recapitalizations also list rental income received by petitioner, general expenses and contributions. The *82 figures for these items were supplied by petitioner, or Evelyn, but there were no records to substantiate such figures. Some tapes were introduced into evidence which listed the breakdowns, but they were also in handwriting, and no cash register tapes were introduced. Nor was there any testimony or other evidence which indicated that all receipts were rung up on the cash registers. Nothing from enterprises other than those mentioned above were shown on the summarization sheets. For example, the books given to respondent's agents for 1943 and 1944 contained only receipts and disbursements from the Showboat and Skyway Club, while petitioner's income tax return for 1943 lists income from the Skyway Club, Showboat, Horseshoe Bar, Rolling Stone, Beat My Shake, Brack, and other property and rents; and petitioner's income tax return for 1944 lists the Showboat, Skyway Club, Rolling Stone, Windmill, The Drum, Fernandina Park Building, Newnan St. Building, Esquire-Fernandina, Englewood, miscellaneous rentals, and gain from sale of capital assets. Tax returns were prepared from these annual recapitulation sheets and additional information was obtained from petitioner or Evelyn. In some instances *83 information for depreciation schedules was obtained from previous tax returns. The revenue agents' report investigating petitioner's 1935 return reported, in part, as follows: "The books and records of the instant taxpayer are very unsatisfactory and many duplications and errors were found. However, in checking the bank account of the taxpayer it was found that a service station owned by instant taxpayer had been mortgaged for $3,000, and this amount had been expended for liquor licenses and no deduction taken on the return. Income from two slot machines was not reported. Taxpayer says that he used this money to pay small bills. These payments were taken as a deduction by the accountant who made the return. In consideration of not making any adjustments it was agreed between the examining agent and the accountant that no adjustment would be made for discrepancies, and no claim would be made for the taxes paid and not claimed. Inasmuch as this seems to be an adjustment favorable to the government the return of income from business is accepted as shown. * * *
"No separate record is made of slot machine income. Taxpayer claims that since they became legal this item has been *84 included in sales. Taxpayer was advised to keep a separate record. All of the machines registered in this taxpayer's name with the exception of two are owned by Sharpe. The two others are owned by the taxpayer." The revenue agents' report investigating petitioner's 1936 and 1937 returns reported, in part, as follows: "Taxpayer keeps no books except a record of cash received and paid out. Receipts and expenditures are posted daily and at the end of each month a summary is made and at the end of the year a recapitulation of the summaries is made. The tax return is prepared from these figures. Income and expenses reported on the returns filed are in agreement with the recapitulation made from the books. All expenditures for lumber and concrete and other building materials have been eliminated from the paid outs as have expenditures made for furniture and equipment. "It will be noted that no inventories are shown on the return, taxpayer operating on the theory that his inventories are so small and so stable that cash purchases would be practically the same as a cost of goods sold figure computed on the basis of inventories. This contention has been accepted. The percentage of gross *85 profit reported after elimination of income from cottages and slot machines was found to be approximately 25%. Bar and whiskey sales probably should be accorded a higher percentage than this, but sandwich and short order sales would reduce the percentage to a figure closely approximating that reported. "Taxpayer constructed his own buildings and his books contained an inventory of these at approximate cost. These figures have been accepted as they are very reasonable and the record of material purchases shown in the cash record maintained by the taxpayer bears out the cost claimed. "No record could be found of a Social Security return under Title IX having been filed for the year 1936. Copy of the 1937 Social Security return could not be located for comparison with income tax return." There was also a partial examination for the year 1938. At the beginning of their investigation, respondent's examining agents requested petitioner's books and records. They obtained a cash journal for 1943 and 1944, books containing salary records of employees, a cardboard carton of numerous waiters' checks for the years 1943 and 1944, and some work sheets. Some cancelled checks and income statements *86 were obtained later after the examining agents had found from their investigations that petitioner had certain bank accounts during 1940 and subsequent years. The examining agents could not reconcile the income and expenditures appearing on the income tax returns for 1943 with the records which had been furnished them and they were furnished no books or records for prior years. They, therefore, searched court records of real estate transfers and, upon discovering that petitioner and Evelyn owned a large amount of real estate during the period under investigation, determined to use the net-worth basis for computation of the income and tax liability of petitioner. The parties have stipulated that in 1934 and each succeeding year, to and including 1944, petitioner paid specified sums of money for purchases of automobiles and acquired other assets, including real estate and furniture and fixtures (other than household furniture), bank balances, U.S. Savings Bonds, and accounts and notes receivable. The stipulation was not inclusive and did not preclude proof of other assets. Such assets were acquired with funds furnished by petitioner at the costs indicated in exhibits attached to *87 the stipulation. The following table sets forth the total figures resulting from such stipulation, which were included in petitioner's net worth as of December 31, 1934, and as of December 31 of each succeeding year to and including December 31, 1944: Bank Balances,
Furniture
Receiv-
Real
and
ables, Pay-
Auto-
Year
Estate
Fixtures
ables, etc.
mobiles
Totals
1934
$ 64,040.70
$ 3,172.58
$ 67,213.28
1935
68,223.70
5,225.22
73,448.92
1936
69,723.70
887.22
$ 2,200.00
72,810.92
1937
77,123.70
2,356.75
( 57.32)
$ 55.75
79,478.88
1938
78,776.45
3,989.75
(1,376.73)
913.00
82,302.47
1939
79,683.70
3,989.75
( 396.36)
1,523.36
84,800.45
1940
73,968.70
4,281.35
( 128.90)
2,570.84
80,691.99
1941
79,198.70
5,824.10
1,975.91
1,270.51
88,269.22
1942
85,246.95
12,417.95
1,612.61
1,053.61
100,331.12
1943
94,872.19
15,814.11
13,119.18
595.14
124,400.62
1944
164,373.59
11,508.11
21,197.98
6,895.00
203,974.68
Accumulated
Reserve
Year
Depreciation
Totals
1934
$ 5,435.81
$ 61,777.47
1935
7,270.77
66,178.15
1936
8,230.86
64,580.06
1937
9,731.86
69,747.02
1938
11,611.49
70,690.98
1939
13,597.42
71,203.03
1940
15,674.25
65,017.74
1941
16,655.60
71,613.62
1942
19,400.56
80,930.56
1943
22,626.28
101,774.34
1944
21,544.49
182,430.19
*88 In addition to those assets which the parties have stipulated for the taxable years in question, the record discloses certain other items which must be included to obtain petitioner's net income for the taxable years in question, as follows: ITEM AND EXHIBIT NOS.
16
18
22
54
21-U
22-V
23-W
Investment
Esquire
in Duval
Lechner
Peasley-
Ingraham
Club
Spirits
Lumber
Gaulbert
Construc-
Year
Building
House
Bldg.
Company
Company
Corp.
tion Co.
1934
$6,374.74
1935
1936
1937
1938
$5,000.00
1939
$3,000.00
5,000.00
1940
3,000.00
5,000.00
1941
$10,500.00
3,000.00
5,000.00
$125.00
$ 314.08
1942
10,500.00
5,000.00
769.38
1,411.58
$151.20
1943
10,500.00
5,000.00
125.00
1,240.83
1944
ITEM AND EXHIBIT NOS.
24-X
11-K
32
Foley
Income
Lot-
Lumber
Taxes
Gift to
Living
Year
Company
Paid
Daughter
Expenses
1934
1935
$ 52.91
$4,000.00
1936
330.91
4,000.00
1937
128.10
4,000.00
1938
59.45
4,500.00
1939
59.45
5,000.00
1940
5,500.00
1941
6,000.00
1942
104.95
6,500.00
1943
405.00
7,000.00
1944
$1,530.76
$500.00
7,000.00
*89 For purposes of clarity, the additional items set forth in the foregoing table will be referred to by their exhibit numbers. Item No. 16. The parties agreed as to the value of the land. A building which was acquired in 1941 was valued at a cost of $10,500. The year of acquisition and the cost of the building were determined by respondent from petitioner's 1943 income tax return which was the first return in which this asset was set forth in the depreciation schedule (both as to cost and as to time of acquisition). This amount less allowable depreciation is includible in petitioner's net worth for the years 1941 through 1943. Item No. 18. The parties agreed as to the value of the land which was acquired by the petitioner in 1939. A house was built on the land in 1939. The assessed value of the house for the year 1942, according to the records of Nassau County, Florida, was $3,000, which figure is the only valuation respondent could discover. This amount of $3,000 less allowable depreciation is includible in petitioner's net worth for the years 1939 through 1943. Item No. 22. The parties agreed as to the value of the land in the amount of $1,400. A building was erected on *90 this property by petitioner subsequent to its acquisition in 1938. The improvement was valued at $5,000. The year the improvement was made and the cost of the building were determined by respondent from petitioner's 1943 income tax return which was the first return in which this asset was set forth in the depreciation schedule. This amount less allowable depreciation is includible in petitioner's net worth for the years 1938 through 1943. Item No. 54. The respondent included $6,374.74 for 1934 as the value of petitioner's capital investment in the Duval Spirits Company, a wholesale liquor business in which petitioner was a partner. This figure was obtained from the books of that company. No evidence was introduced to sustain petitioner's contention that such a figure was too low. The partnership was dissolved in June, 1935, and the item was not carried on as an asset since there was no showing that this investment was not invested in other assets making up petitioner's net worth. The respondent, therefore, left it out after 1934 to prevent duplication. The amount of $6,374.74 is includible in petitioner's net worth for 1934. Items No. 21-U, 22-V, 23-W, 24-X. These items represent *91 purchases made by petitioner from the named companies. They were capitalized by respondent, rather than treated as expense items and therefore increase petitioner's net worth. The Peasley-Gaulbert Corporation sells furniture and fixtures. The bulk of the purchases from Foley Lumber Company was made in a period of about two months, and a large portion of such purchases went to the "Windmill Club." These items were properly capitalized by respondent, and are includible at the values and in the years set forth in the foregoing table. Item No. 11-K. Federal income tax payments made during any year are added to the net worth figure for that year. While not increasing the net worth, they represent a non-deductible expenditure and are therefore included in arriving at net income under this method of computation. The income taxes paid are includible in the amounts and for the years set forth in the foregoing table. Item No. 32. The gift by petitioner is added to the net worth for 1944. While it does not increase petitioner's net worth, it is includible along with the net-worth figure in order to arrive at net income for that year since it represents a non-deductible expenditure. Living *92 Expenses. Like income taxes and the gift of the lot, living expenses should be added back to the income determined by the net-worth increases in order to arrive at the correct net income since they represent non-deductible expenditures. The respondent determined the value for these expenses by taking into consideration the cost of living in the vicinity, the fact that petitioner operated two cars, the number of dependents, petitioner's poor health with resultant medical expenses, and the other items which would go into living expenses. While the stiuplation of the parties included the cost of the automobiles owned by petitioner, it did not include the cost of operating them. The living expenses are includible in the amounts and for the years set forth in the foregoing table. The following items, which do not appear on the foregoing table, are stipulated items and for clarity will be referred to by number. Item No. 27. In 1944 the improved real estate consisting of land and the Esquire Club situated thereon (Item 22), was exchanged for Lot 2, Blk. 3, Hart's Map, Bay & Nownan (Item 27 in the stipulation). The cost of the improvements on Item 22 (which we have found to be $5,000), *93 less depreciation for such improvements at the time of such exchange, shall be added to the cost of Item 27 and allocated to the land included as Item 27, and is includible in petitioner's net worth for the year 1944. Item No. 20. In 1942, the property designated as Lot 3, Sec. 1, Hamby's S/D, Fernandina Beach (Item 18 in the stipulation) was traded on the Park Bldg. (Item 20 in the stipulation). The cost of the improvements on Item 18 (which we have found to be $3,000), less depreciation for such improvements at the time of such exchange, shall be added to the cost of Item 20 and allocated to the land included as Item 20, and is includible in petitioner's net worth for the years 1942, 1943 and 1944. Petitioner was indicted on four counts for wilfully and knowingly attempting to defeat and evade a large part of the income tax due and owing by him for the years 1941 through 1944, inclusive. The jury returned a verdict of not guilty for the years 1941 and 1942, and a verdict of guilty for the years 1943 and 1944 in a trial in the District Court of the United States for the Southern District of Florida, in 1948. The judgment, which was appealed to the Court of Appeals for the Fifth *94 Circuit, was reversed on May 13, 1949, and the cause remanded for a new trial. The retrial, while having been calendared, has not been held due to the poor health of the petitioner as evidenced by letters of his physician. The books and records kept by petitioner for the years in issue did not completely, clearly, and truly reflect his income for such periods. Some part of the deficiency was due to fraud with intent to evade tax for the years 1937, 1938, 1939, 1941 through 1944, inclusive. Opinion RICE, Judge: Under section 41 of the Internal Revenue Code, the Commissioner has the authority to compute taxable income in accordance with the method which, in his opinion, clearly reflects the income where the method employed by the taxpayer does not clearly do so. Petitioner contends the so-called net-worth method can only be used where no books are kept. However, it is well established that such method may also be employed if the records are incomplete, inaccurate, or in some other manner unsatisfactory. Louis Halle, 7 T.C. 245 (1946), affd., 175 Fed. (2d) 500 (C.A. 2, 1949), cert. den. 338 U.S. 949 (1950). Petitioner's *95 books have been shown to be incomplete, and we have set forth instances of their incompleteness in our findings of fact. Nor have those books which he did keep been shown to be accurate. While the figures in the books could be traced through to corresponding figures on the income tax returns, there was no verification of the figures which appeared in the books other than by spot checks of tapes which were hand written. There was no showing as to whose writing was on these tapes nor at what time they were prepared. No cash register tapes, which were supposedly used in making the book entries, were submitted in evidence; nor does the record show that all receipts were rung up on the cash registers. All of petitioner's interests were not reflected by his books and numerous figures which were used in preparing tax returns were given to the person who prepared the return for the petitioner either by him or by Evelyn. No evidence was introduced to verify these figures. Under such circumstances respondent was justified in resorting to a net-worth computation of income. This was amply borne out by his examination of court records showing purchases of real estate during the questionable years *96 totaling over $110,000. Only for the year 1943 is any gambling income reported, and that was $22,000 reported from "Beat My Shake." This was a round figure and no records were introduced to substantiate it. In the instant case, since the years must be lifted out of the statute of limitations, the deficiencies can not stand unless some part of each deficiency was due to fraud with intent to evade tax. The burden of proving fraud is on the respondent and his evidence must be clear and convincing. The intent required is a specific intent, and direct evidence is seldom available to prove fraud. Rather, it must be determined from the surrounding circumstances, including the conduct of the taxpayer, M. Rea Gano. 19 B.T.A. 518 (1930). With the exception of a few items, the parties stipulated the assets owned by the petitioner for the taxable years in question and we have set them forth in our findings of fact. The usual reservation was made in the stipulation that "this stipulation shall be without prejudice to the right of either party to introduce other and further evidence not at variance with the facts herein stipulated." Relative to such reservation, petitioner at the *97 trial attempted to show the existence of a large amount of cash on hand at the beginning of the taxable period in question. Such a showing is typical in cases similar to the instant case. Cf. Arlette Coat Co., 14 T.C. 751 (1950). Petitioner contends that respondent is precluded from using the net-worth statements he prepared because no consideration was given to the cash he had on hand at the close of the year 1934 in the opening net-worth statement. Evelyn testified that when she and petitioner were married in 1926 petitioner had $180,000 in cash which he kept in a safe at home; that at times she helped him to count it; that while her chilren were young she was content to remain at home to keep watch over the money; but that in 1940 she rented a safety deposit box in which she placed about $150,000 or $160,000 which was left from the $180,000 since her children were older and she no longer wished to be tied down at home. Numerous witnesses for petitioner testified that they had seen him handle sums of money varying between $25,000 and $50,000 primarily in the years prior to the taxable years in question. Most of these witnesses were associated in some way with petitioner *98 during the bootlegging era: It is true that petitioner had a reputation of being a bootlegger, but there was no showing that the money which he handled was his own. Nor was there any showing (except for Evelyn's testimony) that any cash he had from the bootlegging era had not been converted into assets prior to the taxable years in question. Evelyn's testimony is not substantially corroborated as to the existence of the $180,000. Nor are we convinced of the veracity and trustworthiness of her testimony. The record is replete with contradictions which she made while on the stand. On the one hand, she testified that prior to 1940 she stayed at home and, on the other, she testified that in the evenings she would go to the Skyway Club to count the cash and at times to act as cashier. Petitioner would also be there at the same time she was away from home. Then too, she testified that she had no safety deposit box and kept the money at home until 1940 at which time she rented a safety deposit box at the Florida National Bank which box was the first one she had ever rented. In rebuttal, respondent showed that in fact Evelyn had such a box from August 21, 1929, until August 8, 1931, with *99 authority for petitioner to enter it. When confronted with these facts, Evelyn admitted the authenticity of the signatures on the box applications, and explained the discrepancy on the ground that she had no recollection whatsoever of these boxes. It is also noted, as the stipulations show, that while petitioner supposedly had this large amount of cash on hand he was having difficulty in making small monthly payments on equipment purchased on conditional sales contracts and at least one of the purchases was repossessed. In addition, payments on principal and interest from Januard 20, 1927, through November 28, 1936, on an installment contract for the purchase of a bungalow providing for payments of $50 per month were small and irregular. In 1931 and 1933, no payments at all were made on principal. Such arrears in payments are not indicative of a man who has purportedly $180,000 (or even $150,000) on hand in cash. Petitioner had no cash account on his books, and prior to 1940 had no bank account. Nor did he ever file a Florida intangible tax return as required for a person with cash on hand. Although certain inaccuracies may result from accepting respondent's figures (from the very *100 nature of the method) the record convinces us that they are reasonably correct, and that on December 31, 1934, petitioner had no other substantial assets in addition to those set forth in our findings of fact. Arlette Coat Co., 14 T.C. 751 (1950). Petitioner, in his argument, has confused the proof required in a civil and a criminal case as to the completeness of an opening net-worth statement. The Government has the burden of proof in a criminal case and that burden never shifts to defendant. United States v. Fenwick, 177 Fed. (2d) 488 (C.A. 7, 1949). However, in a civil case, the statute of limitations acting as a bar, the respondent must establish fraud; but once fraud is established, the statute of limitations does not apply and the petitioner must disprove the deficiencies. See Arlette Coat Co., supra, and Harris v. Commissioner, 174 Fed. (2d) 70 (C.A. 4, 1949). Here, the respondent has shown that the opening net-worth statement was reasonably correct and has convinced us that fraud existed. The deficiencies have been satisfactorily shown. The petitioner complains in brief that the value of certain assets (such as Duval Spirits *101 Company) which were included in the opening net-worth statement were too low, but failed to produce any evidence of a higher value for such assets at the trial. Petitioner has known for several years of the existence of this action (the criminal trial was in 1948), and yet he did not come forth with information peculiarly within his knowledge. The petitioner was not at the hearing of this case due to illness, as shown by a physician's letter, and it was not thought safe to allow his deposition to be taken. He had not taken the stand in the criminal trial. Thus, many facts peculiarly within his knowledge could not be determined. "Discrepancies of 100% and more between the real net income and the reported income for three sucessive years strongly evidence an intent to defraud the Government." Rogers v. Commissioner, 111 Fed. (2d) 987, 989 (C.A. 6, 1940). See Arlette Coat Co., supra. We have discrepancies for seven years which, except for 1937 and 1939, are well over 100 per cent; and for some of the years the discrepancies between the net income computed on the net-worth method and the reported income are well over 1000 per cent. Nor are we at a loss to explain *102 the source of some of such income since there was ample evidence as to petitioner's activity in gambling enterprises. We therefore hold that the respondent did not err in assessing the fraud penalties for the years 1937, 1938, 1939, and 1941 through 1944, inclusive. Having shown that fraud did exist, the statute of limitations does not apply, and the petitioner must show what errors existed in the deficiency arising from those assets which were not stipulated. Harris v. Commissioner, supra. We have considered the evidence and have already set forth our unwillingness to accept evidence of existence of a large amount of cash on hand. Depreciation on depreciable assets listed in petitioner's net worth should be given effect under a Rule 50 computation. Petitioner argues that the value placed upon some of the buildings on his property was too high since he did a lot of the building (such as making cement blocks) himself. No records were kept of such expenditures, and we feel respondent was justified in using the costs and dates of acquisition appearing on petitioner's tax return. In his brief, petitioner contends that there must be added to the beginning net worth of *103 any year an amount representing income of the previous year over and above the net income computed on the net-worth basis. A portion of such argument is as follows: "1936: For the year 1935 the petitioner reported an income of $9,630.44, whereas the constructed net income by the net worth method amounts to but $2,078.85, a difference of $7,551.59. The taxpayer received and paid tax on this difference; and since he did not expend it, we must treat it as on hand. Therefore, to the net worth of $66,178.15 as of December 31, 1935, we must add this sum as being available for the year 1936. There is therefore a net worth at the beginning of 1936 of $66,178.15 plus $7,551.59, a total of $73,729.74." There is no basis in the record for the statement "he did not expend it." Where the net worth basis is used to compute net income, actual receipts and expenditures are not considered. Rather, the annual increase in net worth, adjusted for allowable depreciation, plus non-deductible expenses (such as living expense and personal expenditures) constitute the net income for that year. In using such method, the assumption must be made that all of the taxpayer's income for a year is either used *104 during the year or is reflected in assets on hand at the end of the year. Having found that fraud existed for the years in question, it is unnecessary to consider respondent's argument that the years 1943 and 1944 are governed by section 275 (c) of the Internal Revenue Code which provides that if more than 25 per cent of gross income is omitted a five-year statute of limitations applies. Decision will be entered under Rule 50. Footnotes
1. Evelyn is involved because a joint return was filed in 1944. ↩
2. This figure is incorrect. It should have been $2,032.98.↩